**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| JERRI DARLENE PAYNE, | ) | CASE NO. 3:25-CV-2588 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| | ) | **<u>REPORT AND RECOMMENDATION</u>** |
| Defendant. | ) | |

## I. INTRODUCTION

The Commissioner of Social Security denied Plaintiff Jerri Darlene Payne's application for Supplemental Security Income (SSI). Ms. Payne seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Compl., ECF No. 1.) This matter is before me pursuant to Local Rule 72.2(b). (*See* ECF non-document entry dated Nov. 25, 2025.)

For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II. PROCEDURAL HISTORY

In January or February 2021, Ms. Payne applied to the Social Security Administration (SSA) seeking SSI benefits. (Tr. 1027.)[1] She initially claimed that she became disabled on January 1, 2010, but that date was later amended to January 27, 2021. (*Id.*; Tr. 802, 1031.) She identified two allegedly disabling conditions: (1) arthritis in the back; and (2) chronic obstructive pulmonary disease. (Tr. 1050.)

---

[1] The administrative transcript appears at ECF No. 6. I will refer to pages within the transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 611"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 7") and page-identification numbers (e.g., "PageID# 2987").

The SSA denied Ms. Payne's application initially and upon reconsideration. (Tr. 820, 828, 830, 839.) Ms. Payne requested a hearing with an ALJ. (Tr. 892.) Her counsel submitted a letter – brief in advance of the hearing. (Tr. 1106–19.) The ALJ held a hearing on June 23, 2022, at which Ms. Payne was represented by counsel. (Tr. 797–819.) Ms. Payne testified, as did an independent vocational expert (VE). (*Id.*)

On July 15, 2022, the ALJ issued a written decision finding that Ms. Payne was not disabled. (Tr. 841–63.) Ms. Payne sought review with the SSA Appeals Council, and her counsel submitted a letter identifying alleged errors in the decision. (Tr. 1125–27.) The Appeals Council remanded the matter to a new ALJ in July 2023. (Tr. 870–73.) The Appeals Council instructed the ALJ to consider additional evidence of a back surgery that Ms. Payne underwent a week after the date of the hearing decision. (Tr. 872.)

On remand, the ALJ held a second hearing on August 23, 2024, at which Ms. Payne and a VE provided additional testimony. (Tr. 619–46.) Ms. Payne's counsel submitted a letter–brief in advance of the hearing. (Tr. 1142–50.)

On November 27, 2024, the ALJ issued a second written decision finding that Ms. Payne was not disabled. (Tr. 596–611.) Ms. Payne again sought review with the SSA Appeals Council and submitted a brief through counsel identifying alleged errors. (Tr. 1153–55.) This time, the Appeals Council denied review in September and October 2025, rendering the ALJ's decision the Commissioner's final decision in the matter. (Tr. 1, 8.)

On November 25, 2025, Ms. Payne filed her Complaint, challenging the Commissioner's final decision that she is not disabled. (ECF No. 1.) Ms. Payne raises three assignments of error for review:

> **First Assignment of Error:** The ALJ failed to address significant portions of the medical record resulting in the flawed decision.

> **Second Assignment of Error:** The ALJ improperly relied on the opinions of the state agency medical consultants issued at the initial and reconsideration levels to support the determination that Plaintiff retained the capacity for light work.
>
> **Third Assignment of Error:** In the alternative, the case should be remanded due to new, material evidence which did not exist at the time of the hearing.

(Pl.'s Merit Br. at 9, 12, 13, ECF No. 7, PageID# 2987, 2990–91.)

## III. BACKGROUND[2]

### A. Personal, Educational, and Vocational Experience

Ms. Payne was born in December 1973 and was 47 years old on the date of her application. (Tr. 802, 1027.) Ms. Payne completed the tenth grade. (Tr. 802–03.) She has not worked since 2013. (Tr. 803.) She has some past work history at fast-food restaurants, a factory, a hotel, and a gas station. (Tr. 1051.) She does not currently have a valid driver's license, but she previously held one. (Tr. 627.) She is divorced and has two adult children. (Tr. 803–04, 626.)

Ms. Payne lives alone in an apartment. (Tr. 803.) Her daughter drives her when she needs to go places, but she also has medical transportation coverage and is able to navigate the municipal bus. (Tr. 627.)

### B. Function Reports

Ms. Payne filled out a pain questionnaire in March 2021 as part of her disability application. (Tr. 1060–62.) She wrote that she has pain in her middle to lower back, right knee, and right hand. (Tr. 1060.) The pain radiates down her leg, back, and wrists "all the time"; the pain is severe and she wakes up at night in pain. (*Id.*) She has pain "all the time all day all night never goes away never ends." (*Id.*) The pain is aggravated by standing for long periods (and sometimes

[2] Ms. Payne confines her assignments of error to her physical impairments and related limitations. Thus, I focus my summary on the evidence the parties have identified as related to Ms. Payne's physical impairments and related limitations as I summarize the record, which extends across nearly 3,000 pages.

even short periods), sitting up, and moving around. (*Id.*) She is hardly able to use her hands at all without pain. (*Id.*) She cannot do much of anything due to the pain. (Tr. 1061.) Ms. Payne identified that sometimes a hot bath will help, but the pain comes back promptly. (*Id.*)

In December 2021, Ms. Payne reported to the agency that that her low back pain, radiating into her right hip, had worsened since October 2021. (Tr. 1070.)

In February 2022, Ms. Payne reported that as of January 2022, she had experienced worsening numbness in her right hand that wakes her up at night and makes it hard for her to write or hold her phone. (Tr. 1082.) She wrote that it has become difficult to do things with her right hand over the past few weeks because of numbness. (Tr. 1088.)

### C. Relevant Hearing Testimony

#### *1. Ms. Payne's Testimony*

Ms. Payne testified at the first hearing that she smoked in the past and has emphysema and chronic obstructive pulmonary disease. (Tr. 804.) She grows short of breath when she is walking or running around too much. (*Id.*) Her medicine helps "some." (*Id.*)

Ms. Payne also said that she has back pain; she first noticed the pain after the birth of her son 27 years ago. (*Id.*) She experiences low back pain when she bends over or sits or walks for too long. (*Id.*) She said that her back is "in a lot of pain." (*Id.*) She had undergone a nerve block a few days before the hearing, but it only helped a little. (Tr. 804–05.)

Ms. Payne was diagnosed with bipolar disorder a few months ago. (Tr. 805.) She described her symptoms as feeling "depressed" and "anxiety," and she said that she has some trouble with memory and concentration. (*See id.*) She takes medicine for depression and anxiety. (*Id.*) She feels anxiety daily. (Tr. 808.) She experiences panic attacks "now and again" when she goes out in public; she used to experience them at work. (Tr. 809.) She feels her heart racing and gets "nervous and jittery." (*Id.*)

Ms. Payne testified that she has carpal tunnel syndrome in both wrists. (Tr. 806.) She has had surgery on the right side, as well as procedures to release a trigger finger and trigger thumb. (*Id.*) She needs to undergo surgery on the left now. (*Id.*) Ms. Payne described that she can move her hands and fingers, but they are "sore." (*Id.*) She still finds that her fingers will stick when she picks something up; she is "always dropping things." (*Id.*) She notices this happening when she picks up her phone or does housework like dusting. (Tr. 806–07.) She has trouble with buttons, zippers, and jewelry. (Tr. 811.)

Ms. Payne spends nearly all her time inside her apartment. (Tr. 807.) She does perform housework, but she is in pain and has the difficulty she described with her fingers. (*Id.*) Her right knee "pops and cracks all the time," and it sometimes gives out when she is walking. (Tr. 807–08.) Ms. Payne estimated that she can walk for five to seven minutes before needing to sit. (Tr. 808.) She is not supposed to lift more than 10 pounds. (*Id.*) She can sit for probably 15 minutes before needing to get up. (*Id.*)

Ms. Payne testified that she is able to shop for groceries at the store, but she limits the time at the store because of the pain in her lower back and legs. (Tr. 810.) If she walks for too long, her lower back and knee start hurting. (*Id.*) Ms. Payne takes medicine to help her sleep, but she finds that she is well-rested when she wakes up. (Tr. 811.) She believes her mental health medications are helping. (*Id.*) She does not have problems interacting with others. (Tr. 813.)

At the second hearing, Ms. Payne testified that she has to walk up and down a half flight of stairs (about 15 stairs) to get into or leave her apartment. (Tr. 626.)

Ms. Payne had recently undergone a surgery to fuse her lower spine at L5–S1, and she was anticipating another back surgery that had been ordered but not yet scheduled, pending the progress

on her healing from the first surgery. (Tr. 628–29.) The surgery was expected to be a surgical fusion at the T11–T12 level. (Tr. 629–30.)

Ms. Payne said that the first surgery had helped on the left side, but her right side grew numb and was tingling. (Tr. 633.) She was uncomfortable enough that she consulted with pain management doctors, who prescribed her a "nerve pill." (*Id.*) The medicine helped a little, in conjunction with cortisone injections. (*Id.*) She then underwent a second surgery to remove a cyst and do some more fusing. (*Id.*) After that surgery, her leg on the right side is still numb. (*Id.*)

Ms. Payne described that her ability to stand had grown worse since the first hearing. (Tr. 634.) On one occasion, the pain was so severe in her midback while doing dishes and hosting company that she went to the emergency room. (*Id.*) Ms. Payne can sit for ten or fifteen minutes before she needs to get up. (Tr. 635.) She can walk for about a half block before her hips start "locking up." (*Id.*) She can still grocery shop, but she does so quickly. (Tr. 635–36.)

Ms. Payne testified that she has never been admitted to the hospital for mental health concerns. (Tr. 630.) She engages in talk therapy, which she finds helpful. (*Id.*) She finds her mental health medications to be very helpful. (Tr. 632.) That said, she still gets anxiety when around others, and she does not like working around other people. (Tr. 640–41.)

With respect to her carpal tunnel, surgeries had not helped much. (Tr. 636.) Her hands are still numb from time to time, and her trigger fingers still lock up from time to time. (*Id.*) But she said that she no longer had difficulties with buttons and zippers, and she is able to pick a coin up off the table. (Tr. 636–37.)

Ms. Payne uses the railing to manage the stairs at her apartment, and she uses a walker. (Tr. 637–38.) Prior to her surgical recovery, she was able to bend to tie her shoe. (Tr. 638.) She is able to do household chores, but she has to do them piecemeal with breaks. (Tr. 639.)

With respect to COPD, Ms. Payne finds that her medication is helpful. (Tr. 639.) She uses a nebulizer twice a day. (*Id.*) She takes a daily combination inhaled medication. (*Id.*) And she has a rescue inhaler, which she uses around twice a day. (Tr. 639–40.)

### *2. Vocational Expert's Testimony*

Richard B. Oestreich testified as a vocational expert (VE) at the second hearing. (Tr. 641.)

The ALJ asked the VE to assume that a hypothetical individual with Ms. Payne's age and education had the capacity to perform work at the light exertional level, with additional limitations. (Tr. 642.) Specifically, the person can frequently handle and finger bilaterally. (*Id.*) They can occasionally climb ramps and stairs, stoop, kneel, crouch, balance, and crawl. (*Id.*) They can never climb ladders, ropes, or scaffolds. (*Id.*) They can have occasional exposure to extreme heat, extreme cold, humidity, wetness, fumes, dust, odors, gases, and poor ventilation. (*Id.*) They must avoid all exposure to dangerous moving machinery and unprotected heights. (*Id.*)

The VE testified that such a person could perform the work of a mail sorter (DOT 209.687-026), packager (DOT 559.687-074), or laundry folder (DOT 369.687-018). (*Id.*) The VE confirmed that all three jobs would remain if the person needed an option to change positions no more frequently than 30 minutes while remaining on task. (Tr. 642–43.)

The ALJ next asked the VE to add additional restrictions, in that the work must be able to be learned in 30 days or less and involve only simple routine tasks and routine workplace changes. (Tr. 643.) The work must involve no more than occasional interaction with coworkers, with no tandem tasks. (*Id.*) The person can have occasional interaction with supervisors after the initial training period, and the person can have occasional interaction with the general public. (*Id.*) The work cannot involve a production rate pace, like that of an assembly line, or with hourly productivity goals. (*Id.*)

The VE confirmed that all three jobs would remain available to a person so limited. (*Id.*)

The VE testified that an employee can be off task no more than 10 percent of the workday. (*Id.*) Employers will tolerate up to one absence per month. (Tr. 643–44.) If someone consistently needs longer breaks than the normally scheduled work breaks, that would also be work preclusive without an accommodation. (Tr. 644.)

Ms. Payne's counsel asked whether the jobs identified would remain if the person also needed to use a walker for balance and ambulation. (Tr. 644.) The VE confirmed that they would not, as the use of an ambulation device would be an accommodation. (Tr. 645.)

**D. <u>State Agency Consultants</u>**

A disability examiner (Laura Sminchak), a physician (Gary Hinzman, M.D.), and a psychologist (Ermias Seleshi, M.D.) reviewed Ms. Payne's claim at the initial review level between September and November 2021. (Tr. 820–29.)

Dr. Seleshi opined that Ms. Payne's mental health impairments are not severe, as they do not result in any limitation with respect to Ms. Payne's ability to adapt or manage herself and only mild limitations with respect to the other Paragraph B criteria. (*See* Tr. 824.) Dr. Seleshi did not identify any non-exertional functional limitations. (*See* Tr. 824, 827.)

Dr. Hinzman limited Ms. Payne to occasionally lifting and pulling 20 pounds and frequently up to 10 pounds. (Tr. 825.) He opined that Ms. Payne remains able to sit for six hours and stand and walk for six hours in a typical workday. (*Id.*) He limited Ms. Payne to occasionally climbing ladders, ropes, and scaffolds and frequently climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. (Tr. 826.) He found no environmental limitations except that Ms. Payne should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (*Id.*)

In explaining these decisions, Dr. Hinzman noted that Ms. Payne had been treated for pain and swelling in her right thumb, and for dyspnea on exertion, but an examination showed no limitation in her ability to move her extremities and a normal gait. (Tr. 825.) He identified a severe impairment of COPD but did not find any other physical impairment to be severe. (Tr. 823.)

Based on these opinions, the consultants determined that Ms. Payne could perform light work, including the work of an inserting-machine operator, folding-machine operator, or microfilm mounter and was not disabled. (Tr. 828.)

In a letter to Ms. Payne explaining this decision, the Agency wrote that Ms. Payne may have "difficulty lifting heavy objects" but that it had determined that her condition was not severe enough to keep her from working. (Tr. 880.)

At the reconsideration level, these findings were reviewed by a different disability examiner (Jordanne Finley), physician (W. Scott Bolz, M.D.), and psychologist (David Dietz, Ph.D.) in February 2022. (Tr. 830–40.)

Dr. Dietz identified that Ms. Payne has a new diagnosis of post-traumatic stress disorder, but Dr. Dietz opined that the evidence still only showed mild limitations in her work-related functioning. (Tr. 835.) He agreed that she had no specific non-exertional functional limitations. (*Id.*; Tr. 838.)

Dr. Bolz identified Ms. Payne's spinal impairment to be a severe impairment, in addition to COPD. (Tr. 835.) He affirmed all of the initial level functional limitations, except that he added additional manipulative limitations. (Tr. 838.) Specifically, he limited Ms. Payne to frequent fingering in the right upper extremity. (Tr. 837.)

Based on these opinions, the consultants agreed with the initial level findings that Ms. Payne could perform skilled or unskilled work at the light exertional level, including work as a bin filler, sweatband flanger, or page, and therefore that she was not disabled. (Tr. 839.)

In a letter to Ms. Payne explaining this decision, the Agency wrote that it had determined that she is "able to move about, use [her] arms and legs, and perform daily activities necessary for work activity." (Tr. 891.)

### E. Relevant Medical Evidence[3]

On May 27, 2021, Ms. Payne consulted with James W. Carlier, PA-C, for an initial orthopedic evaluation for low back pain radiating to the bilateral hips and into the right leg. (Tr. 1818.) Ms. Payne described that the pain has been ongoing for 25 years, but over the past several years it had been worsening significantly. (*Id.*) On examination, Ms. Payne did not require any assistive ambulatory devices. (Tr. 1819.) The strength in her lower extremities was full, but she had "4+/5" weakness in right-sided knee extension. (*Id.*) A positive straight leg raise was appreciated for the right leg. (*Id.*) X-ray imaging of the spine revealed subtle scoliosis, mild degenerative changes in the lumbar spine, and a subtle anterior listhesis of L5 over S1. (*Id.*)

[3] Ms. Payne's brief on the merits was filed in a format that is not text searchable. Counsel is reminded that the Court's Electronic Filing Policies and Procedures Manual directs that "[e]lectronically filed documents should be in PDF text searchable format whenever possible." Local Rules – Appendix B, at p.3.

Additionally, when Ms. Payne's counsel cited the administrative record, counsel directed the Court to the page number of the PDF file of the transcript (as opposed to either the electronic ECF PageID# or the transcript page number). For example, counsel's citation to "Certified administrative record page 2450" (*see* ECF No. 7 at 5 n.18, PageID# 2983) corresponds with Tr. 2444 (PageID# 2492), although it is the 2,450th page of the PDF of the transcript. Counsel is reminded that citations must be to the "transcript page number" (*see* Initial Order, ECF No. 3, PageID# 37), meaning the page number stamped on the lower right corner of each page of the transcript.

Observation of the Court's orders and guidance facilitates the Court's timely review of Social Security cases, ensuring that it is clear what exactly a party is referencing and providing for consistency among the parties' briefs and the Court's opinions and orders. That is especially true in a case like this, where the record spans thousands of pages.

The plan after this examination was for Ms. Payne to undergo an MRI scan and begin physical therapy. (Tr. 1820.)

On June 22, 2021, Ms. Payne underwent a surgical procedure to release a right trigger thumb. (Tr. 1825.)

In August 2021, Ms. Payne consulted with Melissa M. Kloeppel, CNP, with respect to her left knee pain. (Tr. 1809.) She described a diffuse, intermittent pain in the left knee over the past two months. (*Id.*) She said the pain was worse with stairs, ambulation, prolonged standing, and transitioning from sitting to standing. (*Id.*) On examination, Ms. Payne was ambulating with a normal gait. (Tr. 1810.) There was no malalignment deformity or effusion noted in the knee. (*Id.*) There was exquisite pain on palpation over the medial joint line, and there was a positive McMurray's test over that joint line. (*Id.*) But range of motion and strength were maintained and sensations were intact. (*Id.*) X-ray imaging revealed no evidence of fracture or dislocation. (*Id.*) Ms. Payne was given a corticosteroid injection and told to follow up in four weeks. (*Id.*)

Ms. Payne consulted with Alec Curry, PA-C, on September 2, 2021, describing significant low back pain and bilateral hip pain that caused her to fear falling due to progressive weakness. (*Id.*) On examination, Ms. Payne was nontender over the midline and paraspinal muscles. (Tr. 1806.) Imaging revealed a mild loss of disc height at L5–S1, although there was no evidence of lumbar spine instability. (Tr. 1807.)

Ms. Payne met with Jared M. Rigali, PA-C, on September 9, 2021, with respect to her bilateral hip pain. (Tr. 1803.) Ms. Payne described her hip pain as severe and sharp, aggravated by lying on her side. (*Id.*) On examination, she displayed full range of motion of the hips and full strength, although there was point tenderness laterally over the greater trochanters. (*Id.*) X-ray imaging showed minimal degenerative joint disease in the right hip. (*Id.*) But the joint spaces were

well-preserved, with no sign of osteophyte formations. (*Id.*) Ms. Payne was diagnosed with bilateral hip bursitis and given steroid injections in both hips. (Tr. 1803–04.) She was instructed to follow up as needed. (Tr. 1804.)

On October 20, 2021, Ms. Payne underwent a procedure to release her right small trigger finger due to stenosing tenosynovitis. (Tr. 1536.)

Ms. Payne consulted with James W. Carlier, PA-C, on October 22, 2021, reporting low back pain. (Tr. 1796.) She reported that she had started physical therapy, which had worsened her symptoms, causing her to stop attending appointments. (*Id.*) She continued to describe low back pain that radiates into the bilateral hips and thighs. (*Id.*) She said her legs "giv[e] out" unpredictably. (*Id.*) On examination, she maintained full strength in the lower extremities, and straight leg raise tests were negative. (*Id.*)

Ms. Payne presented to the emergency department on December 3, 2021, complaining of an exacerbation of her low back pain that prevented her from sleeping. (Tr. 1630–31.) She described a sharp pain going across her lower back and radiating into her right buttock and right thigh. (Tr. 1631.) She said that there was numbness and tingling going into her right thigh. (*Id.*) She said that she was in the process of getting an MRI approved by insurance. (*See* Tr. 1634.) On examination, there was tenderness and bony tenderness noted in the lumbar back, with decreased range of motion and positive straight leg raise tests bilaterally. (Tr. 1633.) Specifically, there was significant point tenderness over the entirety of the lumbar spine, with generalized tenderness over the paraspinal musculature. The pain worsened with right hip flexion and internal and external rotation. (*Id.*) Her strength was diminished (4/5) secondary to discomfort. (*Id.*) Her cervical and thoracic back were normal. (*Id.*) There was tenderness and decreased strength and range of motion in the right hip. (*Id.*) The left hip was normal. (*Id.*) Her gait was normal. (*Id.*)

X-ray imaging of the lumbar spine showed transitional vertebral body anatomy, with lumbarization of the S1 vertebral body segment. (*Id.*) There was multilevel degenerative disc disease present, most pronounced at the lumbosacral junction. (*Id.*)

Ms. Payne was discharged with a corticosteroid and pain medicine, and she was scheduled for a follow up appointment with an orthopedic practice. (Tr. 1634.) On examination, she had exquisite point tenderness over the right long finger and there was palpatory lumpier flexion-extension. (*Id.*) Ms. Payne declined a steroid injection and said she wanted to try an oral steroid, which was prescribed for the long finger. (Tr. 1635.)

Ms. Payne consulted with Dr. Anane-Safeh to follow up on her trigger finger procedures on December 14, 2021. (Tr. 1792.) Ms. Payne reported that her right small finger was doing well, with just a bit of residual swelling around the incision and no further locking or catching. (*Id.*) But she said she had been experiencing some painful locking and catching of her right long finger. (*Id.*)

Ms. Payne consulted with James W. Carlier, PA-C, on January 6, 2022, regarding her low back pain. (Tr. 1789.) Ms. Payne reported that she had started physical therapy but had to stop when she had hand surgery. (*Id.*) It was noted that Ms. Payne's insurance would not approve an MRI scan until she completed six weeks of physical therapy. (*Id.*) On examination, Ms. Payne did not require the use of any assistive ambulatory devices. (*Id.*) She exhibited full strength, although her straight leg raise tests were positive. (Tr. 1790.) She was re-issued a prescription for physical therapy. (*Id.*)

Ms. Payne followed up with Dr. Anane-Safeh on February 22, 2022, regarding her hands. (Tr. 2116.) She complained of increasing bilateral hand pain and paresthesia leading to weakness and poor grip strength. (*Id.*) On examination, Ms. Payne had mild palm swelling with positive

signs indicative of carpal tunnel syndrome. (*See* Tr. 2116–17.) She was assessed to have bilateral carpal tunnel syndrome, and electromyography was ordered. (Tr. 2117.)

Ms. Payne presented to the emergency department on March 28, 2022, complaining that her back pain had been flared up for one day, "similar to other flare up episodes." (Tr. 2169.) Ms. Payne reported that she had not been able to obtain an MRI due to insurance denials. (*Id.*) On examination, there was tenderness and bony tenderness appreciated in the lumbar back, as well as a decreased range of motion. (Tr. 2172.) Her gait was normal. (Tr. 2173.) She was prescribed tramadol for pain and discharged with instructions to follow up with her orthopedic care team. (Tr. 2169, 2174.)

Ms. Payne followed up with Dr. Anane-Safeh on March 30, 2022, to undergo the EMG study. (Tr. 2114–15.) The study showed evidence consistent with bilateral median neuropathies at the wrist, with an assessment of carpal tunnel syndrome that was severe on the right and moderate on the left. (Tr. 2111.) She was scheduled for a right carpal tunnel release procedure. (Tr. 2112.)

Ms. Payne returned to the emergency department on April 20, 2022, this time for abdominal discomfort and nausea from a likely viral gastroenteritis. (Tr. 2132, 2136.) Relevant here, she had no musculoskeletal complaints (Tr. 2132), and on examination she had no musculoskeletal tenderness and normal range of motion. (Tr. 2134.)

Ms. Payne underwent a right carpal tunnel release procedure on April 27, 2022. (Tr. 2083.)

Ms. Payne consulted with Alec W. Curry, PA-C, on May 3, 2022, for a reevaluation of her low back pain. (Tr. 2108.) Mr. Curry noted that Ms. Payne had previously been discharged from physical therapy, with a note indicating that she was in too much pain to complete the exercises. (*Id.*) Ms. Payne described a constant, radiating pain causing her to have difficulty sleeping and to feel progressively weak and limited. (*Id.*) On examination, Ms. Payne was nontender over the

midline and paraspinal muscles. (*Id.*) Imaging showed a very mild levoscoliosis curvature of the lumbar spine and anterolisthesis of L5–S1 that appeared to be degenerative in nature. (*Id.*) Mr. Curry referred Ms. Payne for MRI imaging. (Tr. 2109.)

Ms. Payne met with Mr. Curry again on May 26, 2022, to review the results of that imaging. (Tr. 2278.) The MRI showed lumbar spondylosis without evidence of disc herniation, as well as a minimal listhesis. (*Id.*) Mr. Curry opined that the degenerative anterolisthesis of L5–S1 and other changes may be causing significant foraminal narrowing, causing her pain symptoms on standing. (Tr. 2279.) He recommended a transforaminal nerve block injection. (*Id.*)

Ms. Payne followed up with Jason M. Anane-Sefah, M.D., on June 14, 2022, to follow up after undergoing a right open carpal tunnel release. (Tr. 2310.) Ms. Payne denied further painful paresthesia in her right-hand fingers, and she said she had very little residual numbness in the hand. (*Id.*) But she had some fairly significant pain and sensitivity in the pillar region of the hand "when things bump[] into it." (*Id.*) On examination, there was mild to moderate swelling in the pillar region, accompanied by fairly exquisite tenderness overlying that region. (*Id.*) But she could flex and extend her fingers and thumb, abduct and adduct her fingers and thumb, and oppose the thumb. (*Id.*) Her light touch sensation was now grossly intact. (*Id.*) Overall, Dr. Anane-Sefah found that Ms. Payne was in the process of "routine healing with some pillar pain." (*Id.*) He recommended physical therapy, including ultrasound and pillar massage. (Tr. 2311.)

On June 27, 2022, Ms. Payne began occupational therapy on her hands following up after her right carpal tunnel release. (Tr. 2354.) She complained of pain and poor grip strength, but she noted that she was doing housework and walking a dog for leisure. (*Id.*) On a quick examination, she was significantly functionally limited, although she was healing after the procedure. (Tr. 2354–57.)

Ms. Payne underwent an L5–S1 laminectomy and fusion surgery in July 2022 (Tr. 2884–86).

Ms. Payne followed up with Mr. Carlier on August 9, 2022, reporting an improvement to her radiculopathy since the surgery but saying that she had new right lower extremity numbness when sitting. (Tr. 2444.) On examination, Ms. Payne had full strength of the knees with intact pulses and sensation in the bilateral lower extremities. (*Id.*)

Ms. Payne followed up with Mr. Rigali on September 15, 2022, to discuss her left hip pain. (Tr. 2442.) On examination, there was again tenderness on palpation of the greater trochanter, with full strength and range of motion observed. (*Id.*) Ms. Payne was given another injection in the left hip. (*Id.*)

Ms. Payne met with Dr. Anane-Sefah on September 27, 2022, to discuss her left carpal tunnel syndrome. (Tr. 2438.) She said her right hand "feels really good," and she denied any further pain in that hand. (*Id.*) But she said that, on the left hand, she continued to have painful paresthesia in the left thumb and several fingers. (*Id.*) She said that she had weakness with her grip and pinch on the left. (*Id.*) On examination, she had decreased sensation in the median nerve distribution on the left hand. (*Id.*) Radial nerve distribution, Tinel's, Phalen's, and carpal compression tests were positive across the median nerve at the left wrist. (*Id.*) Ms. Payne said that she wanted to have release surgery, and Dr. Anane-Sefah was agreeable to perform the procedure, noting that Ms. Payne "has done excellently with the right hand" since surgery on that side. (Tr. 2439.)

Ms. Payne underwent the release procedure on October 14, 2022. (Tr. 2881–82.)

Ms. Payne consulted with Jennifer Knous-Ballou, CNP, on November 1, 2022, regarding her back pain. (Tr. 2433.) Ms. Payne reported numbness, tingling, and pain from her right knee down through her calf that was making ambulation difficult. (*Id.*) But she was walking up to one

mile a day. (*Id.*) On examination, she was walking unassisted. (*Id.*) She maintained full strength and range of motion in the bilateral lower extremities. (*Id.*) She was started on gabapentin (Neurontin). (Tr. 2434.)

When Ms. Payne followed up with Dr. Anane-Safeh in December 2022, she said her left hand pain had improved but she was having occasional, infrequent locking/catching of the left thumb that was occasionally painful. (Tr. 2431.) On examination, her sensation was restored but there was again some tenderness and swelling in the pillar region. (*Id.*) There was some mild joint tenderness in the left thumb, although there was no appreciable locking or catching on testing the interphalangeal joint. (*Id.*) Dr. Anane-Safeh assessed that Ms. Payne was recovering from the release surgery but had a new problem of left thumb stenosing tenosynovitis, noting Ms. Payne's history of trigger thumbs. (*See id.*) He administered an injection and told her to follow up if the locking/catching does not resolve. (Tr. 2431–32.)

Ms. Payne followed up with James Carlier, PA-C, on December 9, 2022, with respect to her back surgery. (Tr. 2429.) At that time, she had not yet undergone any physical therapy since the surgery. (*Id.*) Ms. Payne said that her low back pain was improving overall, but she said she continued to have numbness that radiates to her right anterior shin down to her entire right foot. (*Id.*) She was concerned about falling because there were times that she was unsure if she was lifting her foot or not. (*Id.*) But she denied weakness. (*Id.*) On examination, Ms. Payne had full strength with knee extension, dorsiflexion, extensor hallucis longus contraction, and plantarflexion bilaterally. (*Id.*) She had intact sensation to light touch in the lower extremities. (*Id.*) Mr. Carlier recommended physical therapy and started Ms. Payne on a trial of pregabalin (Lyrica). (Tr. 2430.)

Ms. Payne consulted with Dr. Anane-Safeh on January 12, 2023, regarding her right long finger. (Tr. 2427.) She said that the locking and catching had significantly worsened over the past

two weeks. (*Id.*) On examination, there was swelling around the right long finger A1 pulley and exquisite point tenderness. (*Id.*)

Ms. Payne met with Beth Warnecke to request a left hip injection on January 24, 2023. (Tr. 2425.) She received the injection as requested. (*Id.*)

Ms. Payne underwent a surgical release of the right long trigger finger on January 25, 2023. (Tr. 2889.)

Ms. Payne consulted with Frank E. Fumich, M.D., on February 28, 2023, to review an MRI scan of the lumbar spine. (Tr. 2417.) Ms. Payne continued to report persistent numbness in the right calf, foot, and toes. (*Id.*) On examination, she retained full strength and range of motion in the bilateral lower extremities. (*Id.*) MRI imaging showed no evidence of neurocompression of the lumbar spine. (*Id.*) Dr. Fumich opined that numbness may be due to continued nerve healing after her surgery. (*Id.*)

Ms. Payne ultimately underwent a left trigger thumb release procedure in March 2023. She consulted with Amee Croy, CNP, on March 22, 2023, for medication follow up. (Tr. 2870.) She reported no musculoskeletal symptoms and, on examination, had normal movement of all extremities. (Tr. 2872.)

On March 29, 2023, Ms. Payne underwent a left trigger thumb release, at which time the surgeon also removed a cyst from the left thumb flexor. (Tr. 2897–99.)

Ms. Payne consulted with James J. Patterson, M.D., on April 25, 2023, for another right hip injection. (Tr. 2404.) She said her previous injection had lasted for a while and was only just starting to wear off. (*Id.*) She received the injection as requested. (*Id.*)

By May 11, 2023, Ms. Payne said that there had been no further locking or catching and only a slight amount of stiffness in her left thumb. (Tr. 2400.) She denied numbness or tingling in

the hand. (*Id.*) The record notes "work slip return to work/full duty," and Ms. Payne was cleared to move to follow-up appointments only as needed for her hands. (*See id.*)

Ms. Payne followed up with Mr. Carlier on May 25, 2023, continuing to report numbness and tingling in the right leg. (Tr. 2396.) On examination, she had full strength in the bilateral lower extremities but reported decreased sensation in the right calf. (*Id.*) The plan was for her to continue allowing the nerves to heal and to consider further procedures if there was no improvement in two months. (Tr. 2397.)

Ms. Payne met with Mr. Rigali on June 15, 2023, reporting that her left hip injection had improved her pain on that side and requesting a repeat injection on the right side. (Tr. 2394.) On examination, there was tenderness on palpation of the right hip although she maintained full strength and normal range of motion. (*Id.*) She was given the requested injection and instructed to follow up as needed. (Tr. 2395.)

Ms. Payne consulted with Ms. Knous-Ballou on July 20, 2023, regarding her low back pain. (Tr. 2387.) Ms. Payne reported being able to mobilize herself without the use of any assistive devices, but she said she was continuing to have radiating pain through the right lower extremity even a year out from surgery. (*Id.*) X-ray imaging of the lumbar spine showed intact hardware from the surgery and disc height loss most noted at the adjacent L3–L4 level. (*Id.*) On examination, there was normal sensation and full strength in the bilateral lower extremities, with a negative straight leg raise test and negative FABER assessment. (Tr. 2387–88.) An MRI was ordered to evaluate the L3–L4 and L4–L5 levels for consideration of injections versus further surgical intervention. (Tr. 2388.)

Ms. Payne consulted with Beth Warnecke, PA-C, on July 25, 2023, regarding her hip pain. (Tr. 2385.) Ms. Payne requested another injection in the left hip. (*Id.*) She was given the injection and scheduled for physical therapy, with instructions to follow up in three months. (*Id.*)

Ms. Payne presented to the emergency department on August 13, 2023, complaining of back pain radiating to the knee. (Tr. 2796.) She says that the pain increased after she began physical therapy, which she needed to complete in order for her insurance company to approve an MRI. (*Id.*) She reported that she was able to ambulate on the knee. (*Id.*) On examination, she was able to lift the right leg, although she reported that it was painful to do so. (Tr. 2801.) There was a small effusion in the superior lateral portion of the knee. (Tr. 2803.) There was full range of motion of the knee. (*Id.*) Ms. Payne was given Toradol and discharged with Norco, with instructions to follow up with orthopedics. (Tr. 2803–04.)

Ms. Payne presented to the emergency department on May 22, 2024, complaining of an acute exacerbation of her chronic low back pain. (Tr. 2598–99, 2608.) She reported that she "has significant symptoms if she stands for a while and is leaning forward," such as when she is doing dishes. (Tr. 2599.) She denied numbness. (*Id.*) On examination, there was tenderness in the thoracic and lumbar back. (Tr. 2603.) A CT scan of the lumbar spine showed the postsurgical changes from her fusion and laminectomy procedure at L5–S1, but otherwise there was no acute lumbar spine finding. (Tr. 2604.) There was no acute complicating hardware feature noted. (*Id.*) A CT of the thoracic spine showed mild to moderate spinal canal narrowing at T11–T12 due to the calcified buckling of the ligamentum flavum. (Tr. 2605.) Ms. Payne was treated for pain and then discharged with instructions not to perform activities (like dishes) that would cause her to lean forward until she is able to follow up with her regular providers. (Tr. 2607.)

On June 4, 2024, Ms. Payne met with a nurse practitioner to request incontinence supplies for a neurogenic bladder, which she attributed to her spondylosis. (Tr. 2840.) On examination, it was noted that Ms. Payne was ambulating with the assistance of a wheeled walker with a seat. (Tr. 2842.)

Ms. Payne consulted with pulmonologist Georges S. Yacoub, M.D., on June 18, 2024, complaining of shortness of breath. (Tr. 2453.) On examination, Ms. Payne had decreased breath sounds bilaterally. (Tr. 2455.) But she had a normal gait and full ability to move her extremities. (*Id.*)

On July 31, 2024, Ms. Payne underwent surgery to remove the hardware from the L5–S1 level and to fuse L4–L5 and to perform laminectomy at L4 and L5. (Tr. 2887–88.) During the procedure, the surgeons observed that the L5–S1 vertebrae were well fused, indicative of a "very well healed" fusion. (Tr. 2888.) The procedures at L5–S1 and at L4–L5 were completed without complications. (*Id.*)

On September 10, 2024, Ms. Payne consulted with Dr. Anane-Safeh regarding left little finger pain. (Tr. 655.) It was decided to perform a left trigger finger release on the digit. (Tr. 656.)

Ms. Payne followed up with Ms. Knous-Bellou on September 27, 2024. (Tr. 651.) Ms. Payne reported improvement in her right lower extremity radicular symptoms and in her back pain. (*Id.*) On examination, Ms. Payne was walking unassisted. (*Id.*) Imaging showed stability in the spine, with no hardware loosening. (*Id.*) She displayed normal sensation and strength in the bilateral lower extremities. (*Id.*) The plan was for her to refrain from strenuous activity for one month, after which she could gradually increase her activity. (Tr. 652.)

On October 24, 2024, Ms. Payne followed up with Dr. Anane-Safeh regarding her left small finger. (Tr. 649.) She reported that, post release procedure, there was no further locking or catching and well-controlled pain. (*Id.*)

Ms. Payne met with Ms. Warnecke with respect to her hips on December 2, 2024. (Tr. 594.) She requested and received repeat bilateral hip injections. (*Id.*)

Ms. Payne followed up with Ms. Musser on December 3, 2024, for a pain management follow up. (Tr. 591.) Ms. Payne reported that her Norco prescription had been providing around 50 percent improvement in her pain symptoms and allowed her to sit and stand for longer. (*Id.*) She was encouraged to only take the medication as needed, as opposed to her current practice of taking it on a schedule. (*Id.*) The hope was to fully wean her from the medication eventually, now that she is several months out from surgery. (*Id.*) After the appointment, a drug screen came back positive for marijuana, causing Ms. Musser to contemplate stopping the Norco prescription. (Tr. 592.)

Ms. Payne followed up with Mr. Carlier on December 27, 2024, following up after her spine surgery. (Tr. 589.) On examination, there was no tenderness on palpation to the midline or bilateral paraspinal muscles. (*Id.*) X-ray imaging of the spine showed well-placed hardware with no loosening or fracture appreciated. (*Id.*) The levels adjacent to the hardware appeared to be stable. (*Id.*) There was subtle weakness (4+/5) in the right lower extremity, as well as decreased sensation to the right foot. (*Id.*) Mr. Carlier opined that Ms. Payne had no restrictions with regard to her spine surgery and could transition to appointments only as needed. (*Id.*) She was recommended to continue seeing her pain management doctor. (*Id.*)

Ms. Payne consulted with Dr. Anane-Safeh regarding her hands on April 25, 2025. (Tr. 44.) She denied any further locking or catching of her left long finger. (*Id.*) She said that she had "new"

pain about the dorsal ulnar aspect her right hand in a location that had been getting bigger over the past few weeks. (*Id.*) An MRI was ordered to investigate the mass, which was suspected to be potential synovitis. (Tr. 45.)

Ms. Payne received a thoracic epidural steroid injection on May 28, 2025, in an attempt to reach her reported thoracic radiculopathy and neuropathic pain. (Tr. 40.) On examination, there was a mass identified at the location, which was tender to the touch and which was fairly firm. (*Id.*)

Ms. Payne consulted with Ms. Musser on June 24, 2025. (Tr. 38.) Ms. Payne reported minimal relief from a recent epidural injection. (*Id.*) She continued to complain of severe mid-back pain and said she felt as if her arms and legs are very sensitive to touch. (*Id.*) On examination, her lower extremity strength was full, sensation was grossly intact, and she ambulated without an assistive device. (Tr. 39.)

On June 27, 2025, Ms. Payne presented to the emergency department complaining of left hand pain after running out of pain medicine. (Tr. 182.) X-ray imaging showed mild degenerative change, periarticular osteopenia, and a sign of rheumatoid arthritis that the radiologist asked to be worked up clinically. (Tr. 191.) Ms. Payne was discharged with one tablet of hydrocodone, with instructions to follow up with an orthopedics practitioner the following day. (Tr. 187.)

On June 30, 2025, Ms. Payne presented to the emergency department complaining of sudden onset low back pain radiating into her bilateral hips. (Tr. 152.) She said the pain was making it difficult to walk. (*Id.*) On examination, there was normal range of motion in the cervical back, but there was midline lumbar tenderness from L1–L4. (Tr. 153.) She retained full strength in the bilateral lower extremities but displayed a bilateral positive straight leg raise test at 25 degrees. (*Id.*) X-ray imaging of the lumbar spine showed stability since the previous imaging in March

2025. (156.) There was no recurrent disc herniation or canal or foraminal stenosis noted. (*Id.*) It was assessed that there was "no clinical evidence patient has serious spine pathology," although she continued to present with lumbar radiculopathy. (Tr. 158–59.) She was discharged with a steroid dose pack and pain medication (Norco) with instructions to follow up with her spine surgeon. (*Id.*)

On July 2, 2025, Ms. Payne consulted with Faye Imm, PA-C, regarding her left long finger. (Tr. 36.) She reported that she had experienced quite a bit of pain after the surgery. (*Id.*) On examination, the surgical wound was healed but there was localized tenderness. (*Id.*) She reported pain with attempts at total extension of the digit, but she had full passive range of motion. (*Id.*) She was recommended to physical therapy. (Tr. 36–37.)

Ms. Payne consulted with Mr. Carlier on July 8, 2025. (Tr. 34.) She complained of acute low back pain beginning in June 2025, which radiates down the right bilateral lower extremity. (*Id.*) She said she had continued residual right foot numbness. (*Id.*) She said that she had tried thoracic injections without relief of thoracic and lumbar back pain. (*Id.*) She denied changes to her bladder control. (*Id.*) On examination, there was no significant tenderness to palpation over the midline or bilateral paraspinal muscles, but there was tenderness to palpation of the posterior superior iliac spine and a positive FABER test. (*Id.*) Ms. Payne retained full strength and sensation in the bilateral lower extremities. (*Id.*) Mr. Carlier assessed that Ms. Payne has significant thoracic spondylosis and demonstrated symptoms of right sacroiliitis. (*Id.*) He recommended an injection into the SI joint with a consideration for future right SI joint fusion. (*Id.*) He recommended formal physical therapy for the thoracic spine, lumbar spine, and lower extremity core strength. (*Id.*)

On July 22, 2025, Ms. Payne consulted with Ms. Musser regarding her radiating back pain. (Tr. 28.) On examination, the pain was localized to the middle thoracic spine, with muscle tightness

noted in the neck and upper back. (Tr. 29.) Ms. Musser noted that MRI imaging suggested facet arthropathy as the main pain generator, with facetogenic disease suspected based on the imaging and the examination. (*Id.*) No surgical pathology was noted. (*Id.*) The plan was to trial medial branch nerve blocks, to be followed by radiofrequency ablation if the injections are successful. (*Id.*)

On August 6, 2025, Ms. Payne underwent a right SI joint injection. (Tr. 26.)

On August 20, 2025, Ms. Payne underwent medial branch nerve block injections. (Tr. 24.)

The next day, Ms. Payne presented to the emergency department complaining of back pain and chest tightness. (Tr. 50.) She said that she had been told that this could be a side effect of the nerve block injection, but she rated her pain as severe and said that she had barely slept due to pain. (*Id.*) On examination, Ms. Payne reported chest tightness and thoracic back pain, and there was tenderness appreciated on palpation of the posterior mid-thoracic region. (Tr. 54.) A CT scan of the thoracic spine showed mild degenerative disc disease but no acute findings. (Tr. 56.) Ms. Payne was discharged with Norco, lidocaine patches, and muscle relaxant. (Tr. 58.)

On August 25, 2025, Ms. Payne underwent a right SI joint injection. (Tr. 22.)

On September 4, 2025, Ms. Payne underwent a surgical procedure to remove what turned out to be a ganglion cyst in the right hand, with some extensor tenosynovitis also excised during the procedure. (Tr. 18.)[4]

On September 5, 2025, Ms. Payne consulted with Kimberly S. Musser, APRN/CNP, following up with respect to her thoracic spine complaints. (Tr. 15.) Ms. Payne said that the

---

[4] Ms. Payne had been evaluated with respect to the cyst on June 5 and July 16, 2025, with an MRI supporting the diagnosis of a typical ganglion cyst. (*See* Tr. 32, 42.) Ms. Payne presented to the emergency room for an evaluation of the cyst on April 22 and July 16, 2025. (Tr. 106, 110 (evidence of osteoarthritis in the fingers as well), 330 (MRI report), 404.)

thoracic medial branch nerve blocks she received in August 2025 had not provided any relief and had actually worsened her pain. (*Id.*) She was restarted on opiate therapy (Norco, acetaminophen/hydrocodone) pending further follow up with Dr. Fumich. (Tr. 16.)

## IV. THE ALJ'S DECISION

The ALJ determined that Ms. Payne had not engaged in substantial gainful activity since January 27, 2021, the application date. (Tr. 601.)

The ALJ next determined that Ms. Payne had severe impairments of (1) carpal tunnel release; (2) L5–S1 fusion; (3) degenerative disc disease of the thoracic spine; (4) asthma; and (5) obesity. (*Id.*)

The ALJ found that Ms. Payne had non-severe impairments of (1) left trigger thumb release; (2) mild osteoarthritis and bursitis of the left hip; (3) osteoarthritis of the knees; (4) depressive disorder; and (5) anxiety disorder. (Tr. 602.) The ALJ stated that she considered all of the medically determinable impairments, including those that are not severe, when developing the residual functional capacity. (*Id.*)

The ALJ next determined that none of Ms. Payne's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 603.)

The ALJ determined that Ms. Payne had the residual functional capacity ("RFC") to perform work at the light exertional level with a number of additional limitations. (Tr. 605.) Specifically, she can only frequently handle and finger bilaterally. (*Id.*) She can only occasionally climb ramps or stairs, stoop, kneel, crouch, balance, and crawl. (*Id.*) She can never climb ladders, ropes, or scaffolds. (*Id.*) She can have up to occasional exposure to extreme heat, extreme cold, heat, humidity, wetness, fumes, dusts, odors, gases, and poor ventilation. (*Id.*) She should avoid all exposure to dangerous moving machinery and unprotected heights. (*Id.*)

The ALJ found that Ms. Payne has no past relevant work, a limited education, and was 47 years old on the application date. (Tr. 609–10.)

The ALJ then determined that, considering Ms. Payne's age, education, work experience, and RFC, she can perform work that exists in significant numbers in the national economy, including the work of a mail sorter (DOT 209.687-026), packager (DOT 559.687-014), or laundry folder (DOT 369.687-018). (Tr. 610.)

Accordingly, the ALJ determined that Ms. Payne is not disabled. (Tr. 611.)

## V. LAW & ANALYSIS

### A. Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id.* While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

**B. Standard for Disability**

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P,

Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in

the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

**C. Analysis**

**1. *First Assignment of Error – Completeness of the ALJ's Record Analysis***

In her first assignment of error, Ms. Payne argues that the ALJ failed to acknowledge significant, probative evidence in the record before determining the RFC, effectively precluding meaningful judicial review. Ms. Payne points out that the ALJ referenced only five medical records relevant to her lumbar spine impairments. (*See* Tr. 606–08.) She contends that the ALJ ignored evidence that she continued to suffer from right leg radiculopathy and numbness after the 2022 fusion surgery. She says that these omissions are material because, had they been properly considered, they would not have supported an RFC allowing for light exertion work. Finally, Ms. Payne argues that the ALJ failed to cite many of the numerous trigger finger release procedures she underwent over the years, the evidence of which does not support an RFC allowing for frequent handling bilaterally.

The Commissioner defends the ALJ's decision, pointing out that the record in this case is nearly 3,000 pages long and arguing that an ALJ need not directly address every piece of evidence in such a record for her decision to be found supported. The Commissioner points out that, in the records the ALJ cited, Ms. Payne displayed normal movement of the extremities after her surgery and denied numbness in May and June 2024. The Commissioner argues that Ms. Payne is largely relying on her subjective complaints to contradict these normal findings, but the ALJ is not required to accept a claimant's subjective complaints and is permitted to consider the credibility of those statements when making a disability determination.

In reply, Ms. Payne focuses on her hand impairments and characterizes the complete longitudinal record as showing a continued pattern of hand impairments that would preclude

frequent handling and fingering. She points out that "once [she] recovers from one hand procedure, another hand condition develops resulting in the need for surgery." With respect to her lumbar back, she says that many of the records the ALJ cited for normal findings were from appointments unrelated to her back pain.

An individual's residual functional capacity (*i.e.*, the most an individual can still do despite applicable limitations) is an administrative decision reserved for the ALJ. 20 C.F.R. § 1546(c). The ALJ assesses an individual's RFC based on all relevant evidence of record. 20 C.F.R. § 404.1545(a)(1). It is well-established that an ALJ need not discuss each piece of evidence or limitation considered. *See, e.g.*, *Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004)) (finding that an ALJ need not discuss every piece of evidence in the record). But courts do not hesitate to remand where an ALJ selectively considers only portions of the medical evidence that place that claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See, e.g.*, *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *see also Ackles v. Colvin*, No. 3:14CV00249, 2015 WL 1757474, at *6 (S.D. Ohio Apr. 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

After careful consideration, I agree with the Commissioner. Even a cursory review of the ALJ's decision shows that her summary of the record evidence is more extensive than Ms. Payne

suggests. I find that summary to be materially complete and accurate, and Ms. Payne directs the Court to no medical opinion setting forth a more restrictive limitation than those contained in the RFC. Therefore, I find that the RFC is supported by substantial evidence.

With respect to Ms. Payne's hand impairments, the ALJ at Step Two found that her left trigger thumb release was not a severe impairment, accurately pointing out that she progressed very well after her March 2023 release procedure. (Tr. 602 (citing Tr. 2400 (she denied further locking/catching, denied tingling, and admitted only a slight amount of stiffness)). The ALJ acknowledged Ms. Payne's testimony that she frequently dropped things due to both hands being numb and tingling. (Tr. 605.) When summarizing the medical records, the ALJ noted as follows:

> In June 2022, the claimant had a follow-up appointment status post right open carpal tunnel release . . . . She denied any further painful paresthesias in the right-hand fingers. She indicated that she had very little numbness residual in the right hand. She stated that she had some fairly significant pain in the pillar region and sensitivity when bumped. During the examination, there was some mild to moderate swelling about the pillar region of the right wrist. She had fairly exquisite tenderness overlying the pillar region. She could flex and extend her fingers and thumb and abduct and adduct her fingers and thumb. She was assessed with right carpal tunnel syndrome. It was noted that she had routine healing with some pillar pain. 607
>
> In September 2022, the claimant complained of painful paresthesias in the left hand . . . . She noted weakness with her grip and pinch. During the examination, Tinel's, Phalen's, and carpal compression tests were positive across the median nerve in the left wrist. She was assessed with left carpal tunnel syndrome . . . .
>
> In October 2022, the claimant underwent an open carpal tunnel release for left carpal tunnel syndrome . . . .
>
> In December 2022, at the follow-up appointment, the claimant stated that her pain was improved in the palmar aspect of the left hand . . . . She noted occasional infrequent locking and catching of her left thumb, which was painful. During the physical examination, there was mild swelling and tenderness about the pillar region. She had tenderness overlying the left thumb A1 pulley with some stiffness. She was assessed with left hand stenosing tenosynovitis status post left carpal tunnel release . . . .

(Tr. 607.)

Ms. Payne is correct that the ALJ did not specifically acknowledge her June 2021 right trigger thumb release, her October 2021 right small trigger finger release, or her December 2021 complaint of catching and locking in the right long finger. But the omission is not unreasonable; Ms. Payne denied any further painful paresthesia in the right-hand fingers at her appointment in June 2022, as the ALJ noted. (*See* Tr. 2310.) On examination, she could flex and extend her fingers and thumb, abduct and adduct her fingers and thumb, and oppose the thumb. (*Id.*) Her light touch sensation was now grossly intact. (*Id.*) Overall, Dr. Anane-Sefah found that Ms. Payne was in the process of "routine healing with some pillar pain." (*Id.*)

After 2021, the ALJ did accurately summarize the evidence Ms. Payne cites in her brief with respect to the right and left carpal tunnel releases in 2022. (Tr. 607.) And while the ALJ did not specifically cite her 2023 hand procedures, such as trigger finger releases and the removal of a cyst, in each case the medical records reflect routine healing. (*See, e.g.*, Tr. 2870 (normal movement of all extremities after January 2023 release); Tr. 2400 (no further locking or catching in left thumb after release procedure, with a note saying "work slip return to work/full duty"); Tr. 649 (no further locking/catching and well-controlled pain after release procedure for left small finger)). While Ms. Payne insists that her several resolved (and largely not recurrent) hand problems are indicative of a disabling impairment when taken together, in the absence of any opinion evidence or medical record suggesting as much, it is difficult to conclude that the ALJ committed reversible error when she did not specifically discuss these records when formulating the RFC.

Even considering those records Ms. Payne submitted later in the administrative review process—which she would have had the ALJ consider, as set forth in her third assignment of

error—the records reflect continuing hand complaints that are relatively quickly and effectively resolved. (*See, e.g.*, Tr. 44 (no more locking in the left long finger); Tr. 182 (only mild degenerative change in the left hand); Tr. 36–37 (post-surgical tenderness in the left long finger, but full passive range of motion); Tr. 18 (successful removal of a ganglion cyst in the right hand, with some extensor tenosynovitis also successfully excised during the procedure)).

In the end, I do not view the ALJ's summary of the evidence related to Ms. Payne's hand impairments to be materially incomplete or inaccurate. There was no "cherry-picking" here. Considering the standard for "substantial evidence" and considering that Ms. Payne cannot direct the Court to a medical opinion setting forth a handling and fingering limitation more restrictive than that of the RFC, I find no reversible error in the ALJ's consideration of her hand impairments or related limitations.

Turning to her back impairments, the result is the same. The ALJ acknowledged medical records going as far back as January 2021 in which Ms. Payne complained of back or flank pain. (Tr. 606.) The ALJ then continued summarizing the relevant records as follows:

> In May 2021, the claimant complained of constant low back pain . . . . During the physical examination, she did not require the use of any assistive ambulatory devices . . . . There was no tenderness to palpation midline or bilateral paraspinals in the lumbar spine. An x-ray of the claimant's lumbar spine showed a subtle scoliosis convex left with apex at L1-L2, mild degenerative changes, and subtle anterior listhesis of L5 over S1. She had a positive right straight leg raise. She was assessed with spondylolisthesis of lumbosacral region, lumbosacral radiculopathy, and other idiopathic scoliosis in the lumbar region.
>
> In March 2022, the claimant complained of back pain . . . . She was negative for gait problem, myalgias, neck pain, and neck stiffness . . . . During the physical examination, her lumbar spine had tenderness and bony tenderness . . . . She had decreased range of motion. Straight leg raise test was negative in the modified position . . . . Her gait was normal. She was assessed acute exacerbation of chronic low back pain . . . .

In April 2022, the claimant went to the emergency department for abdominal discomfort . . . . She was negative for gait problems, arthralgias, myalgias, neck pain, neck stiffness, dizziness, weakness, and numbness. During the physical examination, her musculoskeletal system had normal range of motion with no tenderness . . . .

In May 2022, the claimant had a follow-up appointment for low back pain . . . . During the physical examination, she was seated in a chair in no acute distress. There was weakness to the left lower extremity with great toe extension and with dorsiflexion. Otherwise, strength was 5/5. A magnetic resonance imaging scan of the claimant's lumbar spine showed evidence of lumbar spondylosis without evidence of disc herniation and minimal listhesis . . . . She was assessed with lumbosacral radiculopathy, spinal stenosis in the lumbosacral region, other intervertebral disc displacement in the lumbosacral region, and other low back pain . . . .

Later that month, a computed tomography scan of the claimant's chest showed multilevel degenerative disc disease in the thoracic spine . . . .

In March 2023, the claimant complained of lower backache and chronic obstructive pulmonary disease . . . . She was assessed with . . . low back pain . . . .

In September 2023, the claimant had a follow-up appointment . . . . She was assessed with . . . low back pain.

In May 2024, the claimant went to the emergency department with back pain . . . . A computed tomography scan of the claimant's lumbar spine showed post-surgical changes with no acute complicating hardware failure . . . . A computed tomography scan of the claimant's thoracic spine revealed mild to moderate spinal canal narrowing at T11-12 due to calcified buckling of the ligamentum flavum. She was assessed with acute exacerbation of chronic low back pain.

In June 2024, the claimant complained of shortness of breath . . . . During the physical examination, she had a normal gait . . . . There was no limitation to movement. There was no articular swelling, tenderness, warmth, or redness.

In July 2024, the claimant underwent removal of hardware including pedicle screws, set screw caps, and bridging rod at the L5-S1 level, assessment of fusion at L5-S1 with a finding of solid bony union, L4-5 posterior lumbar interbody fusion and bilateral posterior fusion of the L4-5 level, and insertion of cage at L4-5, L4 and L5 laminotomy . . . .

(Tr. 606–08.)

The ALJ further acknowledged Ms. Payne's testimony about her back symptoms (*see* Tr. 608), but the ALJ ultimately found that physical examinations largely showed intact gait with normal range of musculoskeletal motion, and that postsurgical scans showed intact hardware with no signs of complication or failure. (*Id.*)

Ms. Payne largely complains that the ALJ did not specifically acknowledge post-surgical records showing that she continued to experience right-sided numbness in the lower extremity after her 2022 fusion surgery.[5] While it is true that the ALJ did not specifically address the right-sided numbness complaints, the ALJ repeatedly acknowledged that—after 2022—Ms. Payne continued to make complaints about and be seen for low back pain, that she began having trouble with the thoracic spine, and that these issues ultimately led to a second surgery in 2024 to remove that hardware. In other words, it is clear that the ALJ reviewed the records Ms. Payne cites in her brief, even if the ALJ did not summarize them exactly as Ms. Payne would have.

I do not view the ALJ's summary of the evidence to reflect "cherry-picking"; to the contrary, it is materially accurate and complete, especially considering the length of this particular record.

Ms. Payne argues that the records reflect a greater degree of weakness in the legs than the ALJ acknowledged, which would preclude light-exertion work. But while Ms. Payne repeatedly complained of right-sided radiculopathy and weakness, on physical examination she consistently displayed full strength in the lower extremities. (*E.g.*, Tr. 2433, 2429 (also denied weakness), 2417

[5] Her argument that the ALJ ignored the evidence related to L4 – L5 is flatly contradicted by the ALJ's acknowledgement that her July 2024 procedure involved "L4-5 posterior lumbar interbody fusion and bilateral posterior fusion of the L4-5 level, and insertion of cage at L4-5, L4 and L5 laminotomy." (Tr. 608.)

(numbness may be due to normal nerve healing), 2396, 2387–88, 2801, 2803, 2599 (denying numbness), 2455 (normal gait), 651 (walking unassisted)).

Ms. Payne points out that she once requested incontinence supplies, but it is not unreasonable for the ALJ to have left that note out because it seems to be a one-off complaint; she repeatedly denied issues with bowel or bladder control. (*See, e.g.*, Tr. 34.) Similarly, while she was once noted to be using a wheeled walker with a seat, the relevant records almost always identify her as able to ambulate unassisted with a normal gait. (*See, e.g.*, Tr. 2455, 2796, 39.)

In the end, I do not view the ALJ's summary of the medical record evidence to be materially incomplete, unduly one-sided, or materially inaccurate. As Ms. Payne can again not point to any medical record opining on a more significant functional limitation than that contained in the RFC, I find no reversible error in the ALJ's recitation of the evidence or decision not to specifically address the records identified by Ms. Payne in her briefing.

I therefore recommend that the Court overrule Ms. Payne's first assignment of error.

### 2. *Second Assignment of Error – State Agency Medical Consultants*

In her second assignment of error, Ms. Payne argues that the ALJ erred in relying on the opinions of the state agency medical consultants where a significant number of medical records were entered into the file after the consultants' reviews. She points out that she has undergone two lumbar surgeries since their review and has received numerous steroid injections in her back, hips, and hands. She says that the ALJ therefore erred in finding these opinions partially persuasive.

The Commissioner defends the ALJ's decision, arguing that the ALJ's RFC assessment was actually *more* restrictive than that opined by the consultants, specifically because the ALJ acknowledged that they did not have all the evidence before them. The Commissioner points out that Ms. Payne does not direct the Court to any opinion stating a limitation more restrictive than

that of the RFC. And the Commissioner concludes that any gap in the treatment record was remedied by the ALJ, who considered the evidence submitted after the reconsideration level.

After careful consideration, I again agree with the Commissioner that the ALJ did not commit reversible error in her consideration of the state agency medical consultants' opinions.

As an initial matter, Ms. Payne does not only perfunctorily attempt to explain what further limitations she would have included in the RFC or which of the state agency consultants' opinions she wishes had been found unpersuasive. It seems as though she primarily takes issue with the consultants' opinion that she can sustain light exertion work (as opposed to, say, sedentary work). But she does not direct the Court to any medical opinion setting forth a more restrictive limitation.

In discussing the opinions of the state agency consultants, the ALJ reasoned as follows:

> State agency medical consultants at the initial and reconsideration levels, Gary Hinzman, M.D., and W. Scott Bolz, M.D., determined that the claimant was able to work at the light exertional level with postural and environmental limitations . . . . In addition, Dr. Bolz found manipulative limitations. The undersigned finds the medical consultants' findings partially persuasive. Although the consultants are non-treating and non-examining sources, the consultants' findings were supported by their review of the underlying record, a detailed explanation, and their familiarity with Social Security regulations and program standards. Their findings are generally consistent with the evidence as a whole, specifically, a computed tomography scan of the claimant's lumbar spine showed post-surgical changes with no acute complicating hardware failure . . . . A computed tomography scan of the claimant's thoracic spine revealed mild to moderate spinal canal narrowing at T11-12 due to calcified buckling of the ligamentum flavum. She was assessed with acute exacerbation of chronic low back pain. However, there were a few non-severe impairments not included so the undersigned has discussed these addition[al] non-severe impairments above.
>
> . . .
>
> In sum, the above residual functional capacity assessment is supported by the diagnostic imaging, treatment records and the physical examinations . . . . Treatment notes in the record do not sustain the claimant's allegations of disabling conditions. More specifically, the medical findings do not support the existence of limitations greater than the

> above listed residual functional capacity. The undersigned acknowledges that the claimant does experience some limitations, which the residual functional capacity above accounts for and describes. Based on the claimant's carpal tunnel release, L5-S1 fusion, degenerative disc disease of the thoracic spine; asthma, and obesity, the undersigned limited the claimant to light exertional level work with manipulative, postural, and environmental limitations.

(Tr. 609).

Agency regulations state that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Instead, the SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). Section 404.1520c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [the ALJ] considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(1). Of the five factors, supportability and consistency are the most important, and an ALJ must explain how the ALJ considered them. 20 C.F.R. § 404.1520c(b)(2). The ALJ "may" but "is not required to" explain how the ALJ considered the remaining factors. *Id.*

Ms. Payne does not specifically frame her argument around any of these factors. She seems to argue that the fact that there is a gap between the PAMF review and the ALJ's decision, combined with the submission of additional medical evidence, renders the PAMF opinions even less than partially persuasive.

I disagree. While it is true that the consultants reviewed Ms. Payne's claims in September and November 2021 (initial review level) and February 2022 (reconsideration level), the Commissioner is correct that "[a]n ALJ may rely on a state agency reviewer who did not review the entire record, so as long as the ALJ also considers the evidence post-dating the opinion." *Laquana Patterson o/b/o L.P. v. Comm'r of Soc. Sec.*, No. 1:16 CV 110, 2017 WL 914272, at *10 (N.D. Ohio Mar. 8, 2017); *c.f. Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 831 (6th Cir. 2009) (approvingly quoting the Magistrate Judge, who reasoned that "There will always be a gap between the time the agency experts review the record and give their opinion with respect to the Listing and the time the hearing decision is issued. Absent a clear showing that the new evidence renders the prior opinion untenable, the mere fact that a gap exists does not warrant the expense and delay of a judicial remand.").

Here, the evidence submitted after the reconsideration level does not render the ALJ's decision untenable. As an initial matter, courts in this district have recognized that "[w]here an ALJ has opinions that account for the majority of the medical evidence, an ALJ may reasonably make judgments on the supportability and consistency of the medical opinions and can adopt residual functional capacity accordingly." *Phelps v. Comm'r of Soc. Sec. Admin.*, No. 1:21-CV-02295-BYP, 2022 WL 18395824, at *9 (N.D. Ohio Sept. 15, 2022), *report and recommendation adopted*, 2023 WL 316016. The consultants accounted for much of the medical evidence here.

To the extent that further records were submitted—and this is particularly relevant to Ms. Payne's spine impairments, for which she continued to seek treatment through 2023 and 2024 before the ALJ rendered her decision, the ALJ explicitly considered that evidence as set forth above. Moreover, the ALJ ultimately adopted a *more restrictive* RFC than the consultants set forth. For example, the ALJ restricted Ms. Payne to only frequent handling with upper extremities (as

opposed to no such limitation), and to frequent fingering with the both upper extremities (as opposed to just on the right). (*Compare* Tr. 837.) The ALJ restricted her from climbing ladders, ropes, and scaffolds (as opposed to occasionally doing so); and she limited her to occasional ramps and stairs (as opposed to frequent). (*Compare id.*)

All in all, I find no error in the ALJ's conclusion to partially credit the state agency consultants' opinions, where the ALJ's conclusions are supported by substantial evidence and where the ALJ clearly considered the evidence obtained after the consultants issued their opinions and provided for a more restrictive RFC based on that evidence. *See Myland v. Comm'r of Soc. Sec.*, No. 17–1592, 2017 WL 5632842, at *2 (6th Cir. Nov. 13, 2017) ("[T]he ALJ properly credited the opinion because it was supported by the totality of evidence in the record, and the ALJ considered the evidence obtained after the consultant issued his opinion.")

I therefore recommend that the Court overrule Ms. Payne's second assignment of error.

**3. *Request for Sentence Six Remand***

In her third assignment of error, Ms. Payne argues that the records submitted to the Appeals Council are new and material, such that the Court should issue a Sentence Six remand to allow the agency to consider these records and issue a new decision. Her arguments flow from her first two assignments of error, as does resolution of this argument.

Ms. Payne argues that the records submitted to the Appeals Council are new and material to the ALJ's decision because they show that she continued to struggle with right lower extremity radiculopathy and numbness, with worsening noted through 2025. She argues that the new evidence similarly shows a deterioration in her hands that is relevant to the ALJ's conclusion that she could perform light work and handle and finger during the relevant disability period.

The Commissioner points out that the Appeals Council concluded that this evidence either did not show a reasonable probability that it would change the outcome of the decision or did not relate to the period at issue.

Under Sentence Six of 42 U.S.C. § 405(g), the District Court does not affirm, modify, or reverse the Commissioner's decision; it does not rule in any way as to the correctness of the administrative determination. *Melkonyan v. Sullivan*, 501 U.S. 89 (1991); *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 734 (N.D. Ohio 2005) ("'Sentence six' of 42 U.S.C. § 405(g) permits a reviewing court to remand, without ruling on the merits."). If a Sentence Six remand is ordered, the District Court retains jurisdiction while the matter is remanded to the Social Security Administration for further proceedings; it is not a final judgment that can be appealed. *Melkonyan*, 501 U.S. 89; *Cross*, 373 F.Supp.2d 724; *Wasik v. Comm'r of Soc. Sec.*, No. 09–14933, 2011 WL 740686 (E.D. Mich. Feb. 24, 2011).

In order for the court to remand a case under Sentence Six, a claimant must show that the evidence is new and material, and that she had good cause for not presenting it in the prior proceeding. *See* 42 U.S.C. § 405(g) ("The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."); *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 653 (6th Cir. 2009) ("It is Allen's burden to make this showing under § 405(g) . . . .").

Here, after careful consideration, I find that Ms. Payne has not shown that the evidence she submitted was material. Evidence is material only if there is "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented

with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711. (6th Cir. 1988).

With respect to Ms. Payne's hand conditions, and as discussed further above, the additional evidence she would have considered show the records reflect continuing hand complaints, but they also reflect that (as with her impairments during the relevant period), that those impairments have been relatively quickly and effectively resolved. (*See, e.g.*, Tr. 44 (no more locking in the left long finger); Tr. 182 (only mild degenerative change in the left hand); Tr. 36–37 (post-surgical tenderness in the left long finger, but full passive range of motion); Tr. 18 (successful removal of a ganglion cyst in the right hand, with some extensor tenosynovitis also successfully excised during the procedure)).

I am not convinced that there is a reasonable probability that, had the ALJ considered these records, she would have concluded that Ms. Payne had a disabling manipulative limitation where the records are qualitatively consistent with those records she had in front of her when she issued her decision.

Similarly, with respect to Ms. Payne's procedures on her back after the ALJ issued her decision, while the records document additional surgical procedures and continued reports of back symptoms, they also continue to reflect full strength in the lower extremities and the ability to ambulate without an assistive device. (*E.g.*, Tr. 39, 153, 34 ). Imaging revealed spinal stability and only minimal degenerative changes. (*E.g.*, Tr. 156, 158–59 ("no clinical evidence patient has serious spine pathology")). Her treatment after her 2024 surgery reflects relatively conservative treatment, including injection therapies combined with pain medication as needed.(*E.g.*, Tr. 29.) I do not view a reasonable probability that the ALJ would have found Ms. Payne limited from light work under these circumstances.

Generally, "[r]ecords that show a lack of improvement, which were created after the ALJ's disability determination, cannot be used to show disability existed at the time of the disability determination." *Wasik*, 2011 WL 740686 at *6. Evidence of the aggravation or deterioration of a condition is not relevant because "it does not demonstrate the point in time that the disability itself began." *Guy v. Comm'r of Soc. Sec.*, No. 11-12828, 2013 WL 1148413, *11 (E.D. Mich. Feb. 19, 2013) (quotation omitted).

Here, that is all Ms. Payne offers in support of her third assignment of error. Even reviewing the substance of these records, there is no reasonable probability that consideration of those records would have led to a different result.

Therefore, I recommend that the Court overturn Ms. Payne's third assignment of error.

## VI. RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated: October 30, 2026

/s/ *Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## VII. NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District

> Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019).